IN THE UNITED STATES DISTRICT COURT, FOR THE
DISTRIC OF THE DISTRICT OF COLUMBIA

Jay Jurdi,
          Petitioner,

-vs-

The United States of America,
          Respondent.

Case: 1:18-cv-01892
Assigned To : Unassigned
Assign. Date : 8/13/2018
Description: FOIA/Privacy Act **(I-DECK)**

PETITION FOR WRIT OF MANDAMUS OR OTHER ORDER UNDER
5 USC SECTION 552(a)(B) COMPELLING RELEASE OF PUBLIC
RECORDS AND DOCUMENTS

    Comes Now Jay Jurdi (Mr. Jurdi), the Petitioner, pro se, pursuant to Title 5, U.S.C. section 552(a)(4)(B), and moves this Court for a writ of mandamus, or other appropriate relief, compelling the United States Department Of Justice to release records in its possession to Mr. Jurdi. In support of his Petition, Mr. Jurdi submits the following:

Statement of The Case/Facts

    Mr. Jurdi was indicted, along with twelve other co-conspirators, on September 12, 2012, charging them with conspiracy to possess with intent to manufacture and distribute methamphetamine, In The United States District Court for the Eastern District of Texas, Case No. 4:12-cr-00180-RAS-DDB-11. See Attachment # A. A Second Superseding Indictment was filed on October 10, 2012, charging the same defendants with the same offense. Id. Among the defendants charged in the Indictment was

Anthony Grasso. Id.

A jury trial was conducted on October 14, 2014, on Mr. Jurdi's behalf. Id. The trial was presided over by the Honorable Richard A Schell, United States District Judge. Id.

Prior to trial, the government entered into plea negotiations with the following co-conspirators: Anthony Grasso, jeremy Glenewinkle, Jorge campos, Jorge Armando Estrada Castro, Victor macias and Jason Lockridge. These defendants ultimately signed plea agreements that required them to give testimony at Mr. Jurdi's trial. Because Mr. Grasso is the subject of the records and documents sought by this Petition, his Plea Agreement has been attached as Attachment #B.

Mr Grasso testified against Mr. Jurdi at the October 14, 2014 jury trial Pursuant to his plea agreement with the government. Attached as Attachment #C is the trial transcript of Mr. Grasso's testimony. Begining on Page 501 of the transcript (identified as 501 in the upper-right hand corner of the transcript), Mr. Grasso identified his plea agreement. On pages 502-503 of the transcript, Mr. Grasso testified that he was a government informant who had been setting up drug transactions with other drug dealers for federal agents so that the federal agents could make arrests of individuals, and that he had worked with federal agents in that capacity before he entered into any kind of agreement with the government in Mr. Jurdi's case.

Mr. Grasso testified about his extensive criminal history, incarceration history, and his criminal involvement in multiple drug trafficking conspiracies, and he revealed the names, methods, and sources involved in those drug trafficking conspiracies. Id. at 471-525.

Drug Enforcement Administration Special Agent Joe Henry Mata (Mata) testified

in relation to the DEA's investigation in this case. See Attachment #L.

Mr. Jurdi made a Freedom Of Information request (FOIA) for records and documents on Mr. Grasso with the DEA. (Request No. 18-00470-F), as well as with the Federal Bureau of Investigation (FBI)(Request No. 1402147-000) See Attachments #'s D and E. Both Agencies denied the requests for information. See Attachments #'s F and G. Mr. Jurdi then appealed to the Office of Information Policy (OIP). See Attachments #'s H and I (FBI Appeal # DOJ-AP-2018-004968) and (DEA Appeal # DOJ-AP-20184969). OIP affirmed both the FBI's and DEA's action on Mr. Jurdi's FOIA requests. See Attachments #'s J and K.

The basis for the OIP's decision was that both Agencies properly refused to "confirm or deny the existence of records responsive to your request." The OIP said that confirming or denying the existence of records responsive to Mr. Jurdi's requests concerning a third party individual would constitute a clearly unwarranted invasion of personal privacy, and could be reasonably expected to constitute an unwarranted invasion of personal privacy, citing 5 USC section 552(b)(6), (7)(C). The OIP affirmed the DEA's action strictly on the privacy concern. However, the OIP affirmed the FBI's action on privacy concerns and watch list interests.

### Arguments & Authorities

The Supreme Court has recognized that the public has a right of access to virtually all proceedings and records in a criminal case. See Richmond Newspaper, Inc. v. Virginia, 448 U.S. 555 (1980); Global Newspaper Co. v. Superior Court, 457 U.S. 596 (1982)(criminal trials); Press-Enterprise Co. v. Superior Courts, 464 U.S. 501, 511-513(1984) (Press-Enterprise I)(voir dire and transcripts); Waller v. Georgia, 467 U.S. 39 (1984) (suppression hearings); Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 15 (1986)

(Press-Enterprise II)(preliminary hearings). The right of access is grounded in the First Amendment and in common law, and extends to all documents filed in pretrial proceedings as well as the trial itself. CBS, Inc. v. U.S. District Court, 765 F.2d 823, 825 (9th Cir. 1985). See also In re Globe Newspaper Co., 729 F.2d 47, 51, 59 (1st Cir. 1984)(the First Amendment right of access "has also been extended to documents filed in pretrial proceedings'); U.S. v. Holler, 837 F.2d 84, 87 (2nd Cir. 1988)(right of access extends to plea hearings and thus to documents in connection with those hearings); In re Washington Post Co., 807 F.2d 383, 390 (4th Cir. 1986)(The First Amendment right of access applies to documents in connection with plea hearings); U.S. v. Peters, 754 F.2d 753, 763 (7th Cir. 1985)("[w]e have recognized that this presumption is of constitutional magnitude through the First Amendment"); Seattle Times Co., v. U.S. Dist. Court, 845 F.2d 1513, 1516 (9th Cir. 1988)("the public and the press have a right of access to criminal proceedings and documents").

The courts routinely find a right of access to documents in criminal cases because these documents easily meet the Supreme Court's two-part test for recognizing a constitutional right of access: (1) "the document is one which has historically been open to inspection by the press and the public; and (2) 'public access plays a significant positive role in the functioning of the particular process in question.'" U.S. v. McVeigh, 119 F.3d 806, 812 (10th Cir. 1997)(quoting Press-Enterprise II, 478 U.S. at 8).

As to part one of the test, it is satified where these documents are routinely made remotely electronically available to the press and public without redaction after 90 days after a party fails to file a request for redaction of the documents. The policy is located on the Federal District Courts' website at www.txed.uscourts.gov.

These documents are made publicly available through the PACER system. See Attachment # A at entry #'s 560-567.

As to part two of the test, it is met where, inter alia, public acces to documents "would tend to operate as a curb on prosecutorial or judicial misconduct and would further the public's interest in understanding the criminal justice system." In re Washington Post, 807 F.2d 383, 389 (4th Cir. 1986)(citing Press-Enterprise II, 478 U.S. at 8).

In addition to the constitutional right of access, the public also has a common law right to inspect and copy public records and documents. U.S. Hickey, 767 F.2d 705, 708 (10th Cir. 1985); Nixon v. Warner Communications, Inc., 435 U.S. 589, 598 (1978). To assert the common law right, Mr. Jurdi has established, through his FOI requests and FOI Appeals a threshold showing of a legitimate need for the records. That requirement was easily met where Mr. Jurdi has shown that Mr. Grasso was a government witness against Mr. Jurdi in Mr. Jurdi's federal, criminal case. Mr. Grasso made statements during his testimony which, if untrue, could result in a new trial for Mr. Jurdi. Mr Grasso testified that he did not receive any concessions for testifying for the government, and that he had never received or heard of any one receiving 50% off of their sentence for their testimony in court, and that he was not anticipating receiving any concession like that. The documents and records on file with the Department Of Justice's Agencies will prove that Mr. Grasso lied to the District Court and to Mr. Jurdi's Jury about this material issue in the case.

Privacy Concerns.

Mr. Grasso was put on notice of his rights concerning privacy. As a matter of Policy, U.S. District Courts give the following notice: "Notice Re Redaction of Transcripts: The parties have seven (7) business days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the

transcript will be made remotely electronically available to the public without redaction after 90 calendar days." This policy is located on the court's website at www.txed.uscourts.gov. The Notice informs the parties that the records will be made available to the public through PACER. Additionally, Rule 5.2 of the Federal Rules of Civil Procedure made Mr. Grasso aware of his privacy rights and his responsibilities associated with those rights. Mr. Grasso took no action, whatsoever, to protect those rights. He did not file the required Notices, he did not request that the court conduct a hearing to seal the records, and he spoke openly in open court about his criminal activities and his life as an informant for the Federal Government. Mr. Grasso has no privacy interests in this regard, and the Respondent cannot articulate a "legitimate reason for preserving... secrecy," United States v. Schlette, 842 F.2d 1574, 1583 (9th Cir. 1988), that would outweigh Mr. Jurdi's "overriding concern with preserving the integrity of the law enforcement and judicial processes," Hickey, 767 F.2d at 708. If the Respondent cannot make this showing, and they cannot, the records must be turned over to Mr. Jurdi. Furthermore, because the information requested by Mr. Jurdi is already in the public realm, the DEA and the FBI cannot justify not releasing the records to Mr. Jurdi, as conceded by them in the case of Rios v. United States, 2017 U.S. Dist. LEXIS 12037 (D.D.C. July 31, 2017).

Government Watch List.

The Respondent denied Mr. jurdi's request for access to records on the ground that an individual's placement on any government watchlist "is protected from disclosure pursuant to 5 U.S.C. section 552(b)(7(E). Exemption (7)(E) concerns records and/or information compiled for law enforcement purposes the release of which would disclose techniques and procedures or guidelines for law enforcement investigations or prosecutions." See Attachment # H.

Mr. Jurdi did not request information or records that would either confirm or

deny the existence of Mr. Grasso being on any government watchlist. However, if Mr. Grasso is on a government watchlist, and was on that watchlist at the time of Mr. Jurdi's prosecution, the government had a continuing obligation to turn that kind of information over to the defense as discovery materials and failed to do so....

Confirming Or Denying The Existence Of Records--Invasion Of Privacy.

The Respondent asserts that the FBI and the DEA "properly refused to confirm or deny the existence of records responsive to [Mr. Jurdi's] request." It claims that confirming or denying the existence of such records "would constitute a clearly unwarranted invasion of personal privacy, and could reasonably be expected to constitute an unwarranted invasion of personal privacy." Citing 5 U.S.C. 552(b)(6), (7)(C). See Attachment #'s H and J. The Respondent also claims that it is reasonably forseeable that confirming or denying the existence of those records would harm the interests protected by the above exemptions, citing People For The Ethical Treatment Of Animals v. NIH, 745 F.3d 535, 544 (D.C. Cir. 2014)(upholding agency's refusal to neither confirm nor deny existence of records that would confirm whether investigation of third party had occurred); and Antonelli v. FBI, 721 F. 2d 615, 618 (7th Cir. 1983)(finding that Confirming whether third has been the subject of investigation would likely "constitute an invasion of that person's privacy that implicates the protections of Exemptions 6 and 7").

This position does not help the Respondent. First, Mr. Jurdi does not seek to know whether Mr. Grasso is the subject of a government investigation. So, those cases do not apply in this case. Second, the Respondent has publicly confirmed the existence of information and records concerning Mr. Grasso. And, the government has also publicly revealed the techniques and procedures used in that investigation (although they do not claim that the techniques, procedures, and guidelines are an issue in these privacy matters).

DEA Special Agent Joe Henry Mata (Mata) testified in Mr. Jurdi's criminal case. See Attachment #L at p. 236. Mata testified that he was contacted by law enforcement personell in the Sherman-Dennison, Texas area for assistance with a methamphetamine problem in that area. Id. at p. 238. Mata was made the case agent in that investigation and he described the duties and responsibilities of a case agent. Id. at p. 238-240. Mata testified that the investigation began with the identification of two primary methamphetamine distributors in that area, Bobby Joe James and Kenneth House. Those individuals were arrested and recruited as government informants. Id. at 241-253. Mata said that the technique he used with James and House resulted in over 40 other individual indictments, including Manuel Camacho and Paul Camacho, his brother. Id. at 254. The techniques used on the Camacho brothers resulted in the arrests of Manuel Urbina, Andy Nguyen, and Hoa Minh Hoang. Id. at 254-258. Jason Lockridge was arrested as a result of information garnered through these techniques. Id. at 259. The investigation continued as a result of the information obtained from Paul Camacho and Andy Nguyen, Mata said. Id. at p. 259-267. The Agent said he discovered that the source of the methamphetamine came directly from Mexico, through a drug distibutor named Arnulfo Hernandez, AKA "Primo," and that Mata learned this information through other informants, phone taps, etc..Id at p. 267. The Agent revealed the types of surveillance techniques used during the investigation, such as Constant surveillance and Sporadic surveillance, and how Agents determine the types of surveillance techniques needed for the particular job. Id. at p. 268. Finally, Mata described how his investigation led him to Anthony Grasso. Id. at p. 269-289.

As demonstrated by the evidence, neither of the Respondent's cases in People For The Ethical Treatment Of Animals v. NIH, or Antonelli v. FBI, supras, have any relevance in this case. The investigation clearly occurred; arrest and convictions resulted; and all of this information was made public. Attachment # A. Because this information is already in the public realm, the Respondent has no basis in law and fact for not

releasing the records and documents to Mr. Jurdi. And for these reasons, and those outlined above, Mr. Jurdi Respectfully requests that this Court order the Respondent to release the requested information to Mr. Jurdi.

Dated: July 8Th 2018

Respectfully Submitted

Jay Jurdi
Reg. No. 20653-078
United States Penitentiary
P.O. Box 26030
Beaumont, Texas 77720